UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,            Cr. No. 15-20394

               v.               District Judge Arthur J. Tarnow

LANEL LOYD,

               Defendant.

_____/

## SUPPLEMENT TO LANEL LOYD'S
## MOTION FOR COMPASSIONATE RELEASE

Over the course of the past two months, more than 4,000 incarcerated people in the Bureau of Prisons (BOP) have contracted COVID-19, and at least 51 federal inmates have died from the disease. This is a far greater rate of infection than the general public. Fortunately, because of the First Step Act, federal courts have authority to release inmates to home confinement rather than have them suffer in hotbeds for infection. Under that authority, over the past month, federal courts around the country have been increasingly granting release to people like Lanel Loyd, non-violent inmates, with low risks of recidivism, who are at particular risk of serious illness or death from COVID-19.

1

Loyd is at a heightened risk of death or serious illness from COVID-19 for three reasons: He immunocompromised from years of corticosteroid injections, and he is obese and has high blood pressure. And he is an excellent candidate for release. So much so, in fact, that staff at his prison, FCI Loretto, encouraged him to apply for home confinement. His most-recent progress report even denotes that he is an appropriate candidate for home confinement. These actions prompted Loyd's family to make arrangements for his homecoming. Yet the BOP then abruptly changed its criteria for home confinement and denied Loyd's release.

In light of BOP's inaction, and the potentially dire consequences if Loyd remains in prison, this Court should exercise its authority to grant relief under 18 U.S.C. § 3582(c)(1)(A)(i) by releasing him and placing him on home confinement for the remainder of his prison sentence.

## I.    <u>Procedural History</u>

Loyd was arrested in June 2015 on charges of conspiracy to possess with intent to distribute controlled substances. PSR ¶ 1. He was released on bond, and remained on bond for almost two years until judgment was entered in March 2017. He complied with all terms of his supervision throughout the case. PSR ¶ 12.

Loyd eventually pleaded guilty to conspiracy to possess with intent to distribute heroin. PSR ¶ 9. The underlying crimes occurred five years ago, from February to June 2015. PSR ¶ 6.

Loyd's criminal history score was just one. He had only one prior conviction, for delivery of marijuana, for which he received a non-custodial sentence. PSR ¶ 39.

Even at the original sentencing, Loyd's medical condition was a concern. He was obese and suffering from untreated hypertension. PSR ¶¶ 50, 52. He also had a history of cortisone shots because of constant pain in his right hip. PSR ¶ 51. This Court noted his physical condition as a reason for a downward variance. (*See* Statement of Reasons, at 3.)

On May 7, 2020, this Court appointed counsel after receiving a letter from Loyd's family requesting compassionate release. (R. 208, Ltr., PgID 1386.) The letter explains that Loyd has serious medical problems putting him at a higher risk for severe illness or death from COVID-19, including being obese, having hypertension, and being immunocompromised because of his corticosteroid injections for hip pain. (*Id.*)

Further, the letter explains that staff at FCI Loretto approached Loyd in April 2020 to encourage him to apply for home confinement under the CARES Act, calling him a "good candidate." (*Id.*) Loyd's prison records confirm this account. His

3

progress report, issued on April 17, 2020, states that "Loyd has been deemed appropriate for Home Confinement under the criteria listed in the Attorney General's COVID-19 Pandemic memorandum." (Ex. 1, Progress Report, at 3.) Loyd signed paperwork to allow his release on home confinement, and at that point, Loyd's family began to make plans for his release.

Yet despite this preliminary determination, the BOP then shifted its opinion and denied Loyd release because of new guidelines from the Attorney General requiring inmates to have completed 50% of their sentence before release. Government counsel has explained that a recent BOP memorandum states that consideration for home confinement is prioritized for inmates who (a) have completed 50% of their sentence or (b) have 18 months or less to serve on their sentence and have completed at least 25% of their sentence. Because Loyd does not meet either category for prioritization, he is not currently being considered for home confinement, despite what BOP staff initially told him.

This account is consistent with news reports of shifting guidelines for home confinement in BOP, causing severe confusion among inmates and family during this difficult time. Walter Pavlo, *The Federal Bureau Of Prisons' "List" Has Caused Confusion In Courts And Prisons*, Forbes, Apr. 24, 2020, https://www.forbes.com/sites/walterpavlo/2020/04/24/the-federal-bureau-of-

prisons-list-has-caused-confusion-in-courts-and-prisons/#4e9dfc4537d4.

Mr. Pavlo's article describes exactly what Loyd's family describes: several inmates were told they were on a "list" to be considered for home confinement, only to them be "notified that they were no longer eligible because they had not served 50% of their sentence." *Id.* Yet "the BOP has no stated policy on what amount of time an inmate has to serve in order to be eligible for Home Confinement under the CARES ACT." *Id.* Mr. Pavlo concludes that substantial resources and "personal pain" might "have been avoided if the BOP just used its own policies." *Id.*

## II.   Legal Standard for Compassionate Release

In December 2018, the First Step Act amended 18 U.S.C. § 3582(c)(1)(A)(i), to permit sentencing judges to consider a defense motion for reduction of sentence based on extraordinary and compelling reasons "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."

Since passage of the First Step Act, courts have recognized "extraordinary and compelling reasons" in several circumstances. In particular, as the BOP faces a rapidly escalating health crisis because of COVID-19, several courts have been recognizing that at-risk inmates, like Loyd, meet the standard for compassionate

release. The pandemic alone is an extraordinary circumstance, and when face with an offender with pre-existing health problems rendering them vulnerable to severe complications from COVID-19, courts are exercising their authority to grant release under § 3582(c)(1)(A)(i). For examples from this district alone, *see United States v, Saladrigas*, Cr No 13-20913, ECF No. 129, Order Granting Release (E.D. Mich. May 13, 2020) (Borman, J.); *United States v. Reddy*, No. 13-CR-20358, 2020 WL 2320093, at *4 (E.D. Mich. May 11, 2020) (Leitman, J.); *United States v. Amarrah*, No. 17-20464, 2020 WL 2220008 (E.D. Mich. May 7, 2020) (Levy, J.); *United States v. Saad*, No. 16-20197, 2020 WL 2251808, at *1 (E.D. Mich. May 5, 2020) (Hood, C.J.); *United States v. Atwi*, No. 18-20607, 2020 WL 1910152 (E.D. Mich. Apr. 20, 2020) (Michelson, J.); *Samy v. United States*, No. CR 16-20610-1, 2020 WL 1888842 (E.D. Mich. Apr. 16, 2020) (Tarnow, J.); *Miller v. United States*, No. CR 16-20222-1, 2020 WL 1814084 (E.D. Mich. Apr. 9, 2020) (Tarnow, J.).

This is particularly true when, as here, the offender is non-violent and was bond-compliant.

### III.    This Court Should Excuse or Waive the 30-day Waiting Period.

Section 3582(c)(1)(A)(i) generally requires exhaustion of administrative remedies. Loyd has asked for home confinement under the CARES Act (at the

urging of staff at FCI Loretto) and was already denied. On May 11, 2020, he also asked for compassionate release, and he has yet to receive a response.

Because the BOP has already rejected Loyd as a candidate for home confinement, this Court should excuse any further need for Loyd to exhaust remedies. Judge Leitman explained, when granting release to a person who had been reviewed for (and denied) home confinement but had not fully exhausted administrative remedies, "the purpose behind the exhaustion requirement of § 3582(c)(1)(A) – providing notice to the BOP of a prisoner's claim for release and giving the BOP more than one opportunity to review the claim before the inmate brings a motion – has already been served by [the defendant]'s Petition and the BOP's recent review of her claim." *Reddy,* 2020 WL 2320093, at *4. This Court should likewise waive exhaustion because the BOP has been made aware of Loyd's request for early release to home confinement—in light of his medical problems and COVID-19—and failed to act.

Moreover, waiting to exhaust would unduly prejudice Loyd, since waiting for the BOP could result in disastrous consequences if he were to contact COVID-19. For that reason, this Court has excused the exhaustion requirement in similar circumstances. *See Samy v. United States,* No. CR 16-20610-1, 2020 WL 1888842, at *2 (E.D. Mich. Apr. 16, 2020) (waiving 30-day waiting period where exhaustion

7

would be futile and unduly prejudicial); *Miller v. United States,* No. CR 16-20222-1, 2020 WL 1814084 (E.D. Mich. Apr. 9, 2020) (same). This Court's decisions are consistent with others in this district and around the country. *Reddy,* 2020 WL 2320093, at *4; *Saad,* 2020 WL 2251808, at *2 (excusing exhaustion for incarcerated person at Milan); *Atwi,* 2020 WL 1910152, at *3 (same); *United States v. Coles*, No. 18-CR-20254, 2020 WL 1899562, at *4 (E.D. Mich. Apr. 17, 2020) (Drain, J.) (excusing exhaustion for incarcerated person at Elkton). The Court should take the same approach here

### IV. <u>Extraordinary and Compelling Reasons Warrant Release</u>

Loyd's pre-existing health conditions, combined with the global pandemic, warrant compassionate release. In particular, Loyd's current health conditions and incarceration during this pandemic "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which [he] is not expected to recover." U.S.S.G. § 1B1.13, cmt. n. 1(A)(ii); *Reddy*, 2020 WL 2320093, at *4; *Amarrah*, 2020 WL 2220008, at *6. He also presents "Other Reasons" under U.S.S.G. § 1B1.13, cmt. n. 1(D), warranting compassionate release, *Miller*, 2020 WL 1814084, at *3, because while the COVID-19 pandemic is devastating in every region it invades, prison populations are subject to heightened vulnerability.

8

**A. The COVID-19 pandemic is ravaging the BOP.**

BOP's statistics show COVID-19's devastation:

- 4,173 inmates have contracted the disease (1,353 of these inmates recovered);
- 548 BOP staff have contracted the disease (282 of these staff members recovered); and
- at least 51 inmates died from it.

Further, the outcry has continued, even from BOP staff, about how poorly this crisis is being handled by BOP. Staff have filed an OSHA complaint alleging BOP has "failed to introduce workplace controls to mitigate or prevent exposure or further exposure to the virus," including at Loyd's facility.[1] More recently, after the death of a young woman who recently gave birth at FMC Carswell, a whistleblower complaint from the BOP staff union for Carswell came to light alleging that the BOP was knowingly misleading the American public about conditions in federal prisons. Keegan Hamilton, *EXCLUSIVE: Whistleblower Warned of Coronavirus Danger in Prison Where a Woman Just Died After Giving Birth*, Vice News, Apr. 29, 2020,

---

[1] *See* OSHA Complaint, https://www.afge.org/globalassets/documents/generalreports/coronavirus/4/osha-7-form-national-complaint.pdf. This complaint was filed in March when there were 28 confirmed inmate cases, 24 confirmed staff cases, and one inmate death. The situation is exponentially worse now.

https://www.vice.com/en_us/article/pke7z8/exclusive-whistleblower-warned-of-coronavirus-danger-in-prison-where-a-woman-just-died-after-giving-birth.

This Court has authority to prevent this type of "playing roulette with people's lives" by replacing Loyd's remaining term with home confinement. Timothy Williams, et al., *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, NY TIMES, Mar. 31, 2020, https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html (quoting NYC Chief Federal Defender David Patton).

**B. Loyd's health places him at high risk of death or serious illness.**

Loyd squarely fits the definition of an individual who has a higher risk of falling severely ill or dying from COVID-19, for three reasons:

*One: Obesity.* Loyd is obese, putting him at high risk of death from COVID-19. Loyd lost some weight in prison, and in December 2019, he had a BMI of 38. (Ex. 5, Medical Record, at 3.) But Loyd reports that he is currently 6'1" and 308 pounds, giving him a BMI over 40. According to the Centers for Disease Control and Prevention, anyone with a BMI of 40 or higher are at higher risk for severe illness from COVID-19. CDC.gov, Coronavirus Disease 2019, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html. Other courts have noted a person's BMI over 40, along with other

10

factors, in granting compassionate release in light of the COVID-19 pandemic. *See United States v. Dawson*, No. 18-40085-HLT, 2020 WL 1812270, at *5 (D. Kan. Apr. 9, 2020) ("The court finds that Mr. Dawson has established that his obesity puts him at an increased risk for severe illness if he were to contract COVID-19, which weighs in favor of finding exceptional reasons."); *United States v. Zukerman*, No. 16 CR. 194 (AT), 2020 WL 1659880, at *5 (S.D.N.Y. Apr. 3, 2020) (noting that movant's obesity placed him "at higher risk for severe illness from COVID-19").

**Two: High Blood Pressure.** Loyd also is at higher risk of death or serious illness from COVID-19 because of his hypertension. *See* American Heart Association Guidance, https://newsroom.heart.org/news/what-people-with-high-blood-pressure-need-to-know-about-covid-19 (explaining that people with high blood pressure "may face an increased risk for severe complications if they get the virus"). Loyd is prescribed daily amlodipine for his hypertension.

Notably, many courts, including at least four in this district, "have identified hypertension as an underlying medical condition that renders a prisoner higher-risk, weighing against continued detention during the COVID-19 pandemic." *United States v. Sanders*, No. 19-cr-20288, ECF No. 35, PgID 202–03 (E.D. Mich. Apr. 17, 2020) (citing *United States of America v. Patino*, No. 18-cr-20451, 2020 WL 1676766, at *2 (E.D. Mich. Apr. 6, 2020) ("Mr. Patino is at high risk due to stage 3

11

chronic kidney disease and hypertension, and his age (63 years old).”); *United States v. Doshi*, No. 13-cr-20349, 2020 WL 1527186, at *1 (E.D. Mich. Mar. 31, 2020) (recommending that prisoner with hypertension and diabetes be placed in home confinement); *Basank v. Decker*, No. 20 Civ. 2518 (AT), 2020 WL 1481503, at *3 (S.D.N.Y. Mar. 26, 2020) (releasing detainee with hypertension from civil immigration detention due to COVID-19 concerns).

Just today, Judge Roberts granted bond release to another person with hypertension in light of COVID-19. *United States v. Bray*, Cr. No. 19-20216, ECF No. 164, PgID 627-28 (E.D. Mich. May 14, 2020). She explained that “new studies identify an increased risk of death from the virus for individuals with hypertension.” *Id.* (citing Deborah J. Nelson, *Blood-pressure drugs are in the crosshairs of COVID-19 research*, REUTERS (Apr. 23, 2020), https://www.reuters.com/article/us-health-conoravirus-blood-pressureins/blood-pressure-drugs-are-in-the-crosshairs-of-covid-19-research-idUSKCN2251GQ; Shiki Garg, Lindsay Kim, et al., *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 – COVID-NET, 14 States, March 1–30 2020*, Morbidity and Mortality Weekly Report, CDC (Apr. 8, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm). Loyd's chronic hypertension thus puts him at particular risk.

12

.

***Three: Immunocompromised.*** Loyd receives injections of corticosteroids for his hip pain. His hip pain is so severe that he was recently issued a cane for mobility, and he has used corticosteroids to manage his pain for several years. (Exs. 4, 5, Medical Records.) In May and June 2019, he was transported for treatment to the Center for Orthopedics and Sports Medicine at Indiana Regional Medical Center in Pennsylvania. (Ex. 6, Medical Center Record.) The doctor there explained that Loyd had a slipped hipbone ("capital femoral epiphysis") that "was never treated properly," and now he "has progress to severe osteoporotic arthritis of the hip." (*Id.* at 4.) He has difficulty tying his shoes and getting out of bed, and he experiences occasional "locking up" of his right hip. (Ex. 5, Medical Records.)

The CDC recognizes that the "prolonged use of corticosteroids and other immune weakening medications" is a risk factor for death or serious illness from COVID-19. CDC.gov, Coronavirus Disease 2019, *People Who Are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. For that reason, at least one court has relied in part on a person's use of corticosteroids in granting compassionate release in the wake of the COVID-19 pandemic. *United States v. Edwards*, No. 6:17-CR-00003, 2020 WL 1650406, at *5 (W.D. Va. Apr. 2, 2020).

13

## C. Conditions at FCI Loretto warrant relief.

Although there are no confirmed cases at FCI Loretto, that does not mean that Loyd is not at an extraordinary risk. Judge Levy recently granted release to another inmate at Loretto—who was 45 years old and 21 months into a 60-month sentence— suffering from pre-existing conditions making him susceptible to COVID-19. *Amarrah*, 2020 WL 2220008, at *3. Judge Levy quoted Mr. Amarrah's description of conditions at Loretto, and she noted that the government "does not dispute this description of current conditions at FCI Loretto":

> [I]nmates currently "eat, sleep, and interact with each other in a confined space, making it easier for the virus to spread once introduced. Inmates are still being transferred between facilities. Although they are screened for symptoms, they are not tested for the virus, leaving potentially asymptomatic individuals to spread the virus to others. While inmates are being subjected to mandatory quarantine, they are still not provided basic protections from the virus in the facilities. Inmates must purchase their own soap. Hand sanitizer is contraband. In low security facilities, inmates are being quarantined with their own unit, as opposed to individual cells, preventing them from complying with social distancing recommendations.

*Id.* at *3.

The court then addressed the government's argument that the lack of positive COVID-19 tests undermines the argument that there are extraordinary and compelling circumstances warranting release:

> FCI Loretto does not have any confirmed cases, and the United States argues that this should be a compelling factor in the Court's analysis.

14

However, it is unclear whether or to what extent FCI Loretto is testing the existing inmate population, and the United States' brief is silent on this issue. Indeed, when the Court questioned counsel for the United States during oral argument, he responded that he "d[id] not know" how or if FCI Loretto was conducting COVID-19 testing of its detained population.

Zero *confirmed* COVID-19 cases is not the same thing as zero COVID-19 cases. The Bureau of Prisons recently discovered this when it found that 70 percent of the inmates it tested were positive for the disease. See Sadie Gurman, *More Than 70% of Inmates Tested in Federal Prisons Have Coronavirus*, The Wall Street Journal (Apr. 30, 2020), https://www.wsj.com/articles/more-than-70-of-inmates-tested-in-federal-prisons-have-coronavirus-11588252023 (noting that "prison officials expect [this number] to rise as they expand testing with a focus on the hardest-hit facilities"). The Southeast Regional Vice President of the Council of Prison Locals referred to "the inside of a[ prison] institution" as a "little petri dish ... a life and death situation [that prison officials then take] home to our families." Id. This disease spreads asymptomatically, which means the Court and the prison system can take no comfort in a lack of confirmed cases, and all parties should be deeply concerned by the lack of universal testing of inmates and staff. *See* How COVID-19 Spreads, CDC (Apr. 3, 2020).

For these reasons, unless and until FCI Loretto implements a universal testing regimen, the Court gives no weight to the zero "confirmed" COVID-19 cases statistic—particularly because BOP is housing detainees together, because the United States could not give the Court any information regarding current testing practices, and because basic disinfecting tools such as soap and hand sanitizer are not universally provided to the population. To the contrary, the Court finds that the lack of testing aggravates its concerns about Defendant's likelihood to contract COVID-19 while in federal custody. Accordingly, the Court finds that extraordinary and compelling circumstances warrant a reduction of Defendant's sentence. The current conditions of Defendant's confinement at FCI Loretto, which Defendant has no power to alter, expose him to a substantial risk of contracting COVID-19. And Defendant's numerous medical conditions render him

15

> substantially likely to suffer a dire outcome should he contract the virus. Together, these factors require the Court to conclude that Defendant is suffering from a serious physical or medical condition that "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which [he] is not expected to recover." 18 U.S.C. § 3582(c)(1)(A)(i).

*Id.* at \*6 (broken hyperlink omitted). This analysis applies with equal force to Loyd, and this Court should find, as Judge Levy did with Mr. Amarrah, that Loyd's situation rises to the level of extraordinary and compelling circumstances warranting release to home confinement.

It is also notable that Loyd was told by staff at Loretto that he was a good candidate for home confinement, only to have that position undermined by contradictory standards issued by BOP. The Legislative Committee of the Federal Public & Community Defenders recently criticized this trend in a letter to Members of Congress, explaining that "[c]onfused and contradictory standards have cruelly resulted in situations where families, informed that a loved one will be transferred to the relative safety of home, are turned away when they arrive at prison gates, and told their loved one is no longer eligible for home confinement." (Ex. 7, FDO Letter, at 6.) They also expressed concern that "these confused standards will disproportionately harm racial and ethnic minorities." (*Id.*)

**D. Other § 3553(a) factors favor release.**

Loyd is not a danger if released on home confinement. He does not have a violent history. He complied with bond for almost two years during the pendency of his case, and this Court permitted him self-surrender.

Loyd has maintained clean conduct for almost two years. He has only one disciplinary action, from June 2017, two months after he entered custody, for "giving/accepting money." He lost 15 days of visiting for the offense. By way of explanation, Loyd incurred this sanction for using another inmate's ticket to take a picture in the visiting room, an action he had failed to understand was against prison policies. He has had no disciplinary actions since then, and is scored by BOP as a "minimum risk" of recidivism. (Ex. 3, Inmate PATTERN Score.) His disciplinary is not an indication that he is dangerous if released, especially given that BOP staff initially designated him as "appropriate for Home Confinement." (Ex. 1, Progress Report, at 3.)

Loyd has consistently engaged in programming while in prison, taking more than 20 classes. His program review comments, "Great programming." (Ex. 2, Program Review at 2.) The courses he has taken include the non-residential drug abuse program, parenting classes, and vocational skills. In 2018, he received his

17

certification in HVAC heat pumps. He works as an orderly, and has paid his financial obligations to the Court.

As indicated in nine attached letters, Loyd has very strong family support and a team of people waiting to help him re-enter society and become a productive citizen. His wife Shawneta Loyd explains that the couple has two children together, and Loyd has four boys total, and that they all love him. (Ex. 8, Shawneta Letter.) She attests to seeing a change in Loyd and says he sees "the wrong in his actions and hopes and prays for a chance to reunite with his children and prove that this time away has changed him into a better human being." (*Id.*)

Other family members also write in support. Loyd's sister-in-law, Novella Dumas, explains how she has personally witnessed significant growth in Loyd, and how he has embraced opportunities to grow in prison. (Ex. 9, Dumas Letter.) She notes, "Every chance he gets, he can be heard telling his children, nieces, and nephews the importance of staying in school and staying steer away from street life." (*Id.*) He recognizes his own mistakes and is striving to be a positive influence on others. (*Id.*) She concludes, "With the strong family support and Lanel's self-determination, he has a low risk of recidivism, and will be a positive, productive human being in society." (*Id.*)

Additionally, Loyd's father-in-law and mother-in-law confirm Ms. Dumas's account and explain how the family prepared for his release after BOP initially informed him about home confinement. (Exs. 10, 11, Taylor and Rev. Taylor Letters.) His mother-in-law writes: "After hearing from Lanel that the prison officials advised him that he was a good candidate for home confinement, and encouraged him to apply, we began preparing to bring him into a safe secure home environment, due to the threat of Cov-19, which places his health at risk of serious illness or death." (Ex. 11, Rev. Taylor Letter.) She adds: "Lanel has proven himself over the three years of incarceration that he been reformed and does not pose a danger to the community." (*Id.*)

Additionally, five other family members and friends write to express support. (Exs. 12-16.) James Dumas writes that he talks to Loyd every week on the BOP email system and that Loyd calls frequently. (Ex. 12, James Dumas Letter.) He says Loyd loves his children and would not waste the opportunity to be with them again. (*Id.*) Nickolas Philips explains how Loyd has mentored him over the years. (Ex. 13, Philips Letter.) Whitney Kimble explains that Loyd has "a solid support system of close family and friends, four sons and countless resources for self-improvement at his disposal." (Ex. 14, Kimble Letter.)

This Court should not hesitate to release Loyd to home confinement.

19

## **Conclusion**

Lanel Loyd respectfully requests compassionate release.

> Respectfully Submitted,
>
> FEDERAL DEFENDER OFFICE
>
> s/Benton C. Martin
> Benton_Martin@fd.org
> 613 Abbott St., Suite 500
> Detroit, MI 48226
> Phone: 313-967-5832

Dated: May 14, 2020

20

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

           Plaintiff,          Cr. No. 15-20394

           v.               District Judge Arthur J. Tarnow

LANEL LOYD,

           Defendant.

_____/

## **CERTIFICATE OF SERVICE**

I certify that on May 14, 2020, I filed the foregoing paper with the through the court's electronic docketing system, which will send notification to opposing counsel of record.

*/s/Benton C. Martin*

21